UNITED STATES OF AMERICA, *ex rel.*
ELIZABETH KELTNER

STATE OF WISCONSIN, *ex rel.*
ELIZABETH KELTNER

        Plaintiffs,

                                              Civil Action, File No. 11-cv-0892

        v.

LAKESHORE MEDICAL CLINIC, LTD.

        Defendant.

## FIRST AMENDED COMPLAINT

        Plaintiffs, United States of America *ex rel.* Elizabeth Keltner and State of Wisconsin ex *rel.* Elizabeth Keltner, through her attorneys, Cross Law Firm, S.C., by Nola J. Hitchcock Cross and Noah Reinstein complain and allege the following:

### Summary Statement

        1.     This action is brought by Relator Elizabeth Keltner on behalf of the United States of America and the State of Wisconsin to recover all damages, penalties and other remedies pursuant to 31 U.S.C. §§3729-3733 and Wis. Stat. §20.931 for knowingly false claims submitted by Defendant to the United States of America and State of Wisconsin through their Medicare and Medicaid programs.

        2.     Defendant Lakeshore Medical Clinic, Ltd., has engaged in a systematic and willful practice of 1) "up-coding" Medicare and Medicaid claims it submits by coding and

billing for services at a level above that justified by the documented services provided; 2) failing and refusing to refund Plaintiffs' payments when Lakeshore Medical Clinic, Ltd. has full knowledge that certain claims it summited to the government for which Lakeshore Medical Clinic, Ltd. was paid were fraudulent; 3) billing Plaintiffs for medically unnecessary procedures resulting in patient harm; 4) billing Plaintiffs for medical services which were never performed; 5) submitting claims to Plaintiffs for ineligible reciprocal billing arrangements; 6) billing Plaintiffs for services performed by ineligible providers; 7) prohibiting staff from reviewing or correcting erroneous coding based upon medical records; 8) otherwise falsifying its claims billed to Plaintiffs by willfully and falsely certifying compliance with required billing and coding guidelines in violation of state and federal laws and regulations; and 9) unlawfully retaliating against Relator when Defendant terminated her employment.

3.     Relator claims a share of the recovery for such false claims as a *qui tam* plaintiff relator as authorized by 31 U.S.C. §3730(d), payment of attorneys' fees and costs, and she further claims damages for retaliation against her for her protected conduct as authorized by 31 U. S C § 3730(h).

4.     Relator claims a share of the recovery for such false claims as a *qui* tam plaintiff relator, for attorneys' fees and costs, and for damages for retaliation against her due to her protected conduct as authorized by Wis. Stat. §20.931.

## Parties

5.     Relator, ELIZABETH KELTNER, is a citizen of the United States of America and a resident of the State of Wisconsin, residing at 6095 Tulip Lane in the City of Greendale and County of Milwaukee, State of Wisconsin 53129.

6.     At all material times, Relator was and is a Certified Professional Coder through the

2

American Academy of Professional Coders and, since July 2010, a Certified Healthcare Auditor through the Association of Health Care Auditors and Educators.

7.      Relator was employed by Defendant Lakeshore Medical Clinic, Ltd. from February 13, 2006 thru her termination on October 11, 2011.  As an employee of Defendant, Relator's duties included auditing billing and coding of services administered by its healthcare providers.

8.      Relator brings this action on behalf of the UNITED STATES OF AMERICA pursuant to 31 U.S.C. § 3730(b)(1). The United States of America is a sovereign country whose Department of Health and Human Services ("HHS") pays claims submitted to it by Lakeshore Medical Clinic, Ltd. through Medicaid and Medicare programs.

9.      Relator brings this action on behalf of the STATE OF WISCONSIN pursuant to §20.931, Wis. Stats. to recover monies paid to Lakeshore Medical Clinic, Ltd. by the State of Wisconsin for false claims for medical services, supplies and procedures.

10.     Defendant LAKESHORE MEDICAL CLINIC LTD. is a Wisconsin corporation with its principal place of business at 100 South 15th Avenue in the City of South Milwaukee, County of Milwaukee, State of Wisconsin 53172. Its Registered Agent is Michael Lappin at 750 W. Virginia Street Milwaukee, WI 53204.

11.     Lakeshore Medical Clinic, Ltd. is a multi-specialty medical group that offers primary care as well as twenty (20) different sub-specialties at fifteen (15) neighborhood clinics staffed by over one hundred (100) primary care and specialty physicians.  All of Lakeshore Medical Clinic's clinics are located the Greater Milwaukee, Wisconsin area.

**Jurisdiction and Venue**

12.     Jurisdiction lies in this Court pursuant to 28 U.S.C. §§1331, 1345 and 31 U.S.C. §3732(a).

3

13. Jurisdiction over the Wisconsin law claims is appropriate pursuant to 28 U.S.C. §1367 and 31 U.S.C. §3732(b).

14. Venue is proper in the Federal District Court, Eastern District of Wisconsin *inter alia,* pursuant to 28 U.S.C. §1391because Defendant is subject to personal jurisdiction in the Eastern District of Wisconsin based on its systematic and continuous contacts in this district.

15. Before filing this complaint, Relator informed the United States Department of Justice, Office of the United States Attorney for the United Stated District Court of the Eastern District of Wisconsin of the allegations being investigated by Relator and of Relator's intent to file this action.

16. None of the allegations set forth in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation or from the news media.

17. Relator Elizabeth Keltner has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. Relator has knowledge of the information on which her allegations are based that is independent from any public disclosure about the matter and that materially adds to any such public disclosures.

18. Relator has submitted a disclosure statement to the United States Department of Justice together with the service of this Complaint on the United States Attorney General, State of Wisconsin Attorney General and the United States Attorney for the Eastern District of Wisconsin.

<u>**Background**</u>

**Medicare/Medicaid Information**

19.     The Medicare program was created in 1965 as part of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.,* to provide a federally funded health insurance program for the aged and disabled. The Center for Medicare and Medicaid Service ("CMS"), a component of HHS, administers the Medicare program.

20.     The Medicare Program is comprised of four parts designated as Medicare Parts A, B, C, and D. Medicare Part A (42 U.S.C. §§ 1395c - 1395i-5) covers services furnished by hospitals and other institutional providers. Medicare Part B (42 U.S.C. §§ 1395j - 1395w4) offers coverage for medically necessary physician services, outpatient care, and some other services not covered by Part A.

21.     Physicians who participate in the Medicare program are reimbursed at a rate outlined in a physicians' fee schedule in accordance with 42 U.S.C. § 1395w-4(a)(1)-(2); 42 C.F.R. § 414.4.  Payment amounts under the fee schedule are calculated by multiplying (1) the relative value of a service; (2) the conversion factor for the particular year; and (3) the geographic adjustment factor applicable to the locality in which the service was provided as set forth in 42 U.S.C. § 1395w-4(b)(1).

22.     Defendant Lakeshore Medical Clinic derives a substantial portion of its total revenue, upon information and belief, nearly 30% from payment for services covered by Medicare and Medicaid.

23.     CMS is authorized by Congress, as established in 42 U.S.C. § 1395w-4(c)(5), to establish a uniform code for identifying physicians' services for use in completing Medicare and Medicaid claim forms.

24.     To effectuate a uniform code for identifying physicians' services, CMS utilizes a Healthcare Common Procedure Coding System ("HCPCS"). The HCPCS is divided into two

5

principal subsystems, referred to as Level I and Level II. Level I is comprised of a numeric coding system establish by the American Medical Association and entitled "Current Procedural Terminology" ("CPT") that is a common language for coding physician services and procedures for purposes of seeking government funds through reimbursement from Medicare and Medicaid. The Level II HCPCS, which is maintained and distributed by CMS in conjunction with private payer organizations as set forth in 42 C.F.R. § 414.40(a), is a standardized coding system that is used primarily to identify products, supplies, and services not included in the CPT codes, such as ambulance services and durable medical equipment.

25.     HCPCS codes must be used by all "health plans" which include, inter alia, Parts A and B of the Medicare and Medicaid programs, as set forth in 45 C.F.R. § 160.103.

26.     Healthcare providers under Medicare Bart system submit claims for reimbursement on CMS 1500 electronic 4010A1 claim forms.

27.     The claim forms include the appropriate codes, including CPT, HCPCS, HCPCS II, ICD-9-CM, as well as "modifiers" to describe the services rendered and billed.

28.     In order to bill the government through the Medicare or Medicaid programs, a health care provider must sign the CMS 1500 form, attesting to the fact that they "certify that the statements on the reverse apply to the bill and are made a part thereof."

29.     The statements on the reverse of every CMS 1500 claim form include the following language regarding providing knowingly false information: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

30.     The statements on the reverse of every CMS 1500 claim form include the following

language regarding certification of medical necessity: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations."

31.     CMS publishes a Medicare Claims Processing Manual that sets forth instructions on how CPT codes are billed. The CMS Manual System Publication 100-04 covers Medicare Claims Processing. The CMS Manual System Publication 100-02 covers Medicare Benefit Policy. The CMS Manual System Publication #45 is the State Medicaid Manual.

**Medicare and Medicaid Coding Procedure for Evaluation and Management Services to Ensure Proper Levels of Service and Payment**

32.     LMC's healthcare providers bill Medicare and/or Medicaid for the time that they spend with a patient for evaluation and management ("E/M") service during an office visit. These E/M services vary with respect to, among other factors, the time an LMC healthcare provider spends with the patient, as well as the complexity and severity of the health-related issued addressed by LMC's healthcare providers.

33.     E/M services comprise approximately forty (40) percent of the benefit dollars paid under Part B of the Medicare Program.

34.     The Medicare Claims Processing Manual Pub. 100-04 Chapter 12, Section 30.6.7 governs the payment for E/M visits by Medicare patients. Wisconsin Medicaid has adopted the CMS documentation guidelines for E/M services as set forth in Wisconsin Medicaid and BadgerCare Information for Providers, Publication No. 2006-70.

35.     To bill Medicare and/or Medicaid for E/M services provided to an existing patient, Lakeshore Medical Clinic's healthcare providers must truthfully describe the healthcare

7

service provided based on CPT code levels of service 1 through 5, which are codes 99211 through 99215. The Medicare current payment rates are as follows: code 99211 rate is $19.71; code 99212 rate is $41.45; code 99213 rate is $68.97; code 99214 rate is $102.72; and code 99215 rate is $137.60. The related 2011 Wisconsin Medicaid Fee Schedule is as follows: code 99211 rate is $12.19; code 99212 rate is $21.96; code 99213 rate is $30.30; code 99214 rate is $47.65; and code 99215 rate is $69.83.

36. To bill Medicare and/or Medicaid for E/M services provided to a new patient, Lakeshore Medical Clinic's healthcare providers must truthfully describe the healthcare service provided based on CPT code levels of service 1 through 5, which are codes 99201 through 99205. The 2011 Medicare Fee Schedule for CPT codes 99201-99205 is as follows: code 99201 rate is $24.83; code 99202 rate is $68.51; code 99203 rate is $98.76; code 99204 rate is 121.07; and code 99205 rate is $189.53. The 2011 Wisconsin Medicaid Fee Schedule is as follows: 99201 rate is $22.00; 99202 rate is $37.01; 99203 rate is $55.33; 99204 rate is $79.16; and 99205 rate is $100.71.

37. To bill Medicare and/or Medicaid for E/M services provided for initial hospital admissions, Lakeshore Medical Clinic's healthcare providers must truthfully describe the healthcare service provided based on CPT codes 99221 – 99223. The 2011 Medicare Fee Schedule is as follows: code 99221 rate is $93.09; code 99222 rate is $127.03; and code 99223 rate is $138.78. The 2011 Wisconsin Medicaid Fee Schedule is as follows: code 99221 rate is $60.63; code 99222 rate is $66.79; and code 99223 rate is $76.46.

38. Medical documentation of the services provided to the patient must justify the level of Evaluation and Management service to justify billing at the corresponding CPT code to submit claims to the government.

39.     Billing of an E/M service and related CPT code must be based on medical records verifying the patient history, examination, and medical decision making which was actually involved.

40.     In order to code a Level 5, CPT code 99215, for E/M service to an existing patient, the medical documentation must verify at least two of the three key components: 1) comprehensive history; 2) comprehensive examination; and 3) highly complex medical decision making.

41.     In order to code a Level 5, CPT code 99205, E/M service for a new patient, the medical documentation must verify an outpatient visit which included 1) a comprehensive history, 2) a comprehensive examination; and 3) highly complex medical decision-making.

42.     In order to code a Level 3, which is CPT code 99223, E/M service for a new hospital admission, the medical documentation must verify initial hospital services for the evaluation and management of a patient, which require 1) a comprehensive history; 2) a comprehensive examination; and 3) highly complex medical decision-making.

**LMC Policy Prohibits Documentation Review by Coders to Ensure Proper Levels of Service & Allows Healthcare Providers to Code with Little or No Oversight**

43.     At LMC, after a healthcare provider performs a service for a Medicare or Medicaid eligible patient, the healthcare provider documents and/or signs off on the health record of the patient and completes an "encounter form" which contains patient information, billing information, and name of healthcare provider.

44.     LMC Policy and Procedures (P&P) Reference #45 regarding "Coding [E/M] Hospital Service(s)"states in pertinent part: "Level of service(s) should be selected & written by the performing provider. . . ."which is entered on an "encounter form."

45.     On information and belief, the LMC healthcare provider physicians are paid, in

9

part, based upon revenue generated.

46. The LMC coding team retrieves an electronically scanned version of the encounter form.

47. The LMC billing system is designed to submit electronic versions of Medicare/Medicaid claim forms directly to the government for Medicare/Medicaid payment.

48. LMC instructs its coding team not to verify whether the medical documentation supports the level of service reported on the encounter form. If the code formatting on the encounter form is correct on its face, the form is sent to the data entry team which enters the information into the LMC billing system to generate a claim form.

49. LMC P&P Reference #45 regarding "Coding [E/M] Hospital Service(s)" states in pertinent part: "The coders will not be responsible for choosing the level of service."

50. LMC's billing and coding policies ensure that providers' claims are submitted for reimbursement without review of medical documentation unless there are obvious errors on the face of the form that cannot be corrected without such review, such as if the form has not been completed.

**Annual Audits Discover a Large Percentage of Coding Errors by Healthcare Providers**

51. As a Coding Auditor for LMC, part of Relator's duties was to perform yearly random audits of twenty-five (25) office visits for each of LMC's healthcare providers. LMC gave a "passing grade" to providers whose error rate did not exceed ten percent (10%). The "error rate" calculation primarily includes inflated billing to Medicare/Medicaid, such as up-coding or billing for medically unnecessary procedures.

52. In early 2010, Relator instituted a follow-up audit for those LMC providers with a billing error rate that exceeded thirty percent (30%).

53.     Prior to Relator instituting the above follow-up audit policy in early 2010, LMC conducted no follow-up or any further review for any level of error rate detected in its random audits.

54.     In or around June of 2010, LMC directed Relator to cease performing yearly audits and the practice ceased altogether.

55.     Relator has personal knowledge of audit results since 2002 which show a high level of failure rates for multiple health care providers at LMC. The following are the results for some LMC healthcare provider audits:

- Dr. Bradley Fedderly – 2010 LMC Audit; 18 correct out of 25 (72%) = Fail

- Dr. Laura Brudsky – 2010 LMC Audit; 11 correct out of 25 (44%) = Fail

- Dr. George Cherayil – 2009 LMC Audit; 15 correct out of 25 (60%) = Fail

- Dr. Michael D'Amico – 2006 LMC Audit; 17 correct out of 25 (68%) = Fail

- Dr. Arlen Delp – 2007 LMC Audit; 20 correct out of 25 (80%) = Fail

- Dr. Gina Dorneanu – 2009 LMC Audit; 22 correct out of 25 (88%) = Fail

- Dr. Richard Hayes – 2007 LMC Audit; 21 correct out of 25 (84%) = Fail

- Dr. ShereenMohis – 2010 LMC Audit; 17 correct out of 25 (68%) = Fail

- Dr. David Munoz – 2009 LMC Audit; 19 correct out of 25 (76%) – Fail

- Dr. John Obudzinski – 2009 LMC Audit; 9 correct out of 25 (36%) = Fail; 2007 LMC Audit; 12 correct out of 25 (48%) = Fail

- Dr. Sacha Ramirez – 2007 LMC Audit; 21 out of 25 (84%) = Fail

- Dr. Sandhya Sureddi – 2010 LMC Audit; 17 out of 25 (68%) = Fail; 2nd 2010 LMC Audit; 10 out of 25 (40%) = Fail

- Dr. Jack Tertadian – 2009 LMC Audit; 13 out of 25 (56%) = Fail

56. Another of Relator's duties as LMC Coding Auditor is to contact those LMC healthcare providers whose medical documentation consistently lacks support for the coded level of service used for reimbursement by the government and to notify them of their errors. Through this work for LMC, Relator gained direct knowledge of the provider billing errors, the providers' willful and continued repetition of the false use of high levels of billing codes, and LMC's refusal to correct the false billings.

57. Relator conducted "Provider Educations" with LMC providers who had consistently high rates of overbilling. The "Provider Educations" were one-on-one reviews with the providers to confirm that overbilling was prohibited and to reiterate the medical service and medical verification of that service necessary for billing at various CPT code levels. Despite these "Provider Educations," LMC providers continued to claim higher levels of service than was appropriate and LMC continued to prohibit its staff from verifying appropriate CPT billing codes based upon the medical evidence of such procedures and services.

58. An example of a "Provider Education" was a March 2, 2010 summary provided to Dr. Bradley Fedderly which showed eleven (11) patient visits which Dr. Fedderly billed higher level, codes than could be supported by the medical documentation of the services that were actually provided. Dr. Fedderly billed all patients at Level 5 and included an additional CPT code 82270 for a hemoccult lab screen. All audits revealed that the documentation only supported coding a Level 4 E/M service and that an additional CPT code for a screening hemoccult lab was not authorized because it is part of the E/M service. All eleven (11) of the patients' dates of service were in February 2010; ten (10) of the eleven (11) were Medicare/Medicaid patients.

59. LMC's policy of allowing healthcare providers to code their own services without

12

oversight allows consistent false billing and ensures a practice of up-coding by not requiring proof that the levels of services being billed are supported by proper medical documentation.

**Implementation of New Level 5 Coding Policy to Correct Fraudulent Billing Practices**

60.　In a March 18, 2010 email from Joan Wolfgang, Coding QI & Provider Education Director, to Dawn Maloney, Lead of Coding, and Relator, Wolfgang initiated the following policy:

> "Effective April 1, the coders will request the notes and complete an audit form. If they agree with the level 5, the charge will be processed. If not, they will attach their audit form and send to audit for education."

Thereafter, the coders were instructed to pull the medical documentation of all the encounter forms that included Level 5 E/M services. The coders were instructed to verify whether the correct level of service was being billed by the healthcare provider. This change was reflected on the coders' "Coding Responsibilities" sheet that informs the coders of their duties, but was short lived following management intervention as set forth below.

61.　Implementation of the new coding policy resulted in a number of "Provider Educations" regarding the practice of up-coding, including but not limited to the following examples:

> a) July 18, 2010, "Provider Education" initiated by the coding staff to provider Dr. Bradley Fedderly showed eight (8) patient visits where the medical documentation failed to support the level of service billed. Dr. Fedderly billed all patients at Level 5 and included an additional CPT code 82270 for a screening hemoccult lab on five (5) of the eight (8) patients. All audits revealed that the documentation only supported coding a Level 4 E/M service and that an additional CPT code for a screening hemoccult lab was not authorized

13

because it is part of the E/M service.

b) June 2, 2010 and September 8, 2010 "Provider Education" initiated by the coding staff to provider Dr. Jack. Tertadian showed seven (7) patient visits where the medical documentation failed to support the level of service billed. Dr. Tertadian billed all patients at Level 5. All audits revealed that the documentation supported coding a Level 4 or a Level 3 E/M service.

c) A July 13, 2010, "Provider Education" initiated by the coding staff to provider Dr. John Obudzinski showed four (4) patient visits where the medical documentation failed to support the level of service billed. Dr. Obudzinski billed all four patients for a Level 5 E/M service. All audits revealed that the documentation supported only coding a Level 4 or a Level 3 E/M service.

62. The Level 5 auditing policy helped limit the amount of fraudulent billing from LMC to the government through the Medicare/Medicaid programs. In 2009, when there was no policy in place to audit Level 5 E/M services, there were sixty-three (63) "Provider Educations" that related to billing of services at levels higher than that supported by documentation. In 2010, with the Level 5 E/M service auditing policy in place, there were ninety-eight (98) "Provider Educations" that took place regarding levels of service not supported by the medical documentation. This represented an increase of over fifty (50) percent between 2009, when auditing was not occurring and 2010, when the auditing policy was in place.

63. Despite the implementation of the new auditing procedure for Level 5 visits, LMC routinely submitted claim forms for payment of E/M services performed by LMC's healthcare providers at a higher level than was supported by the patient's medical documentation. The following examples were coded and billed at a higher CPT code than justified by the medical

documentation.

    a) On August 6, 2010, Dr. Obudzinski billed Medicare patient I.D. for a Level 5 E/M service, CPT code 99215. An audit of the claim shows that the medical documentation does not support the level of service that was coded. The medical documentation for the visit only supports a Level 4 E/M service, CPT code 99214, because the medical history is only detailed, the medical decision-making is of a moderate complexity and the exam is incomplete. Medicare was fraudulently billed for CPT code 99215 at a rate of $125.37 although the service provided justified only CPT code 99214 with a rate of $92.88.

    b) On August 6, 2010, Dr. Obudzinski billed Medicare patient D.M. for a Level 4 E/M service, CPT code 99214. An audit of the claim shows that the medical documentation does not support the level of service that was coded. The medical documentation for the visit only supports a Level 3 E/M service, CPT code 99213, because the history is incomplete arm without HPI, the exam was expanded problem focused, and the medical decision-making is only moderate complexity. Medicare was fraudulently billed for CPT code 99214 at a rate of $92.88 when, in fact, Medicare should have only been billed for the CPT code 99213 rate of $61.91

**Defendant's Termination of Level 5 Coding/Auditing Policy in Order to Allow Healthcare Providers to Continue Up-Coding Without Review**

    64.    Due to the success of the above described new Level 5 auditing policy, LMC was unable to fraudulently bill as many Level 5 E/M services in 2010. In or about January 2011, LMC's Senior Vice President Elizabeth Ojeda ordered that the above-described audit policy

15

initiated by Wolfgang cease.

65.     In about January 2011, Ojeda instructed Relator to inform the LMC coding and auditing staff to cease the Level 5 auditing policy.

66.     Since the termination of the Level 5 audit policy, up-coding has continued and is now unabated by any type of oversight or review.

67.     Relator has direct knowledge of fraudulent up-coding since LMC directed that Level 5 review cease. Examples include but are not limited to:

    a)  On July 8, 2011, Dr. Fedderly billed Medicare patient J.P. for a Level 5 E/M service, CPT code 99215. An audit of the claim shows that the medical documentation only supports a Level 4 E/M service, CPT code 99214, because the medical decision-making is of a moderate complexity and the medical history is incomplete due to dementia of the patient. Medicare was fraudulently billed for CPT code 99215 at a rate of $137.60 rather than the correct CPT code 99214 which commands a rate of just $102.72.

    b)  On August 6, 2011, Dr. Obudzinski billed Medicare patient B.E. for a Level 4 E/M service, CPT code 99214. An audit of the claim shows that the medical documentation only supports a Level 3 E/M service, CPT code 99213, because the history is problem focused, the exam was expanded problem focused, and the medical decision-making is of a high complexity. Medicare was fraudulently billed for CPT code 99214 at a rate of $102.72 rather than the correct CPT code of 99213 which commands a rate of $68.97.

    c)  On July 12, 2011, Dr. Obudzinski billed Medicare patient R.S. for a Level 4 E/M service, CPT code 99214. An audit of the claim shows that the medical

16

documentation only supports a Level 3 E/M service, CPT code 99213, because the history is incomplete with no HPI, the exam was expanded problem focused, and the medical decision-making is of a moderate complexity. Medicare was fraudulently billed for CPT code 99214 at a rate of $102.72 when documentation only supports CPT code 99213 at the rate of $68.97.

d) On August 1, 2011, Dr. Allen billed Medicare Patient C.S. for a Level 4 E/M service, CPT code 99214. An audit of the claim shows that the medical documentation only supports a Level 3 E/M service, CPT code 99213, because the history is expanded problem focused, the exam was comprehensive, and the medical decision-making is unclear. Medicare was fraudulently billed for CPT code 99214 at a rate of $102.72 when documentation only supports CPT code 99213 at the rate of just $68.97.

e) On July 12, 2011, Dr. Obudzinski billed Medicare patient J.B. for a Level 4 E/M service, CPT code 99214. An audit of the claim shows that the medical documentation only supports a Level 3 E/M service, CPT code 99213, because the history is incomplete with no HPI, the exam was expanded problem focused, and the medical decision-making is of a moderate complexity. Medicare was fraudulently billed for CPT code 99214 at a rate of $102.72 when, Medicare should have only been billed for CPT code 99213 rate of just $68.97.

f) On July 12, 2011, Dr. Obudzinski billed Medicare patient J.L. for a Level 4 E/M service, CPT code 99214. An audit of the claim shows that the medical documentation only supports a Level 3 E/M service, CPT code 99213,

because the history is incomplete with no HP1, the exam was expanded problem focused, and the medical decision-making is of a moderate complexity. Medicare was fraudulently billed for CPT code 99214 at a rate of $102.72 when, in fact, Medicare should have only been billed for CPT code 99213 rate of just $68.97.

68. On June 8, 2011, Dr. Sureddi billed Medicare patient E.B. for a Level 3 E/M service for initial hospital care, CPT code 99223. Medical documentation documents only a "detailed" exam and history, not the required "comprehensive" exam or history. The medical documentation only supports a level of 99221. LMC fraudulently billed Medicare for CPT code 99223 at a rate of $138.78, when, in fact, Medicare should only have been billed the CPT code 99221 rate of just $93.09.

69. On June 8, 2011, Dr. Byom billed Medicare patient E.B. for a Level 3 E/M service for initial hospital care, CPT code 99223. However, the medical documentation does not support this level of service. The medical documentation supports a "detailed" exam and history, not the required "comprehensive" exam and history. The history is incomplete because it does not include family medical history. The medical decision-making is of a moderate complexity. The medical documentation only supports a level of CPT 99221. However, LMC fraudulently billed Medicare for CPT code 99223 at a rate of $138.78, when, in fact, Medicare should only have been billed the CPT code 99221 rate of $93.09.

70. Despite termination of the Level 5 auditing policy, Relator attempted to audit Level 5 E/M services by instructing her auditors to pull documentation for Level 5 billing.

71. On October 11, 2011, Relator was terminated by LMC. The stated reason was that Relator was not responding to providers in a timely manner. Relator objected to this reasoning as

18

no complaints had ever been made in that regards. Upon her objection, Relator was informed by Human Resource employee Mary Donovan-Pope that it "just wasn't working out."

72. On information and belief, upon Relator's termination, Jill Tom instructed LMC auditors Jim Dolan and Jennifer Stolpa to stop all audits of all procedures.

**Defendant Falsely Billed Medically Unnecessary Diagnostic X-rays of Pre-MRI Orbits & Performed the Medically Unnecessary Procedure Resulting in Patient Harm**

71. Medicare/Medicaid rules and regulations prohibit submitting claims for payment of medically unnecessary services. Social Security Act § 1862(a)(1)(a) requires that, "All billed services must be based only on activities that are reasonable and necessary for the diagnosis or treatment of illness or injury."

72. Seeking payment for medically unnecessary services is an act designed to obtain reimbursement for a service that is not warranted by the patient's current and documented medical condition. 42 U.S.C. § 1395y(a)(1)(A) requires that "no payment may be made under part A or part B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of the malformed body member".

73. 42 C.F.R. § 411.15(k)(1) states "[t]he following services are excluded from coverage: [a]ny services that are not reasonable and necessary for one of the following purposes for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

74. 42 C.F.R. § 410.32 states in part, diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific

19

medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. 42 C.F.R. § 411.15(k)(1).

75. Defendant LMC's radiologists routinely subject patients to radiation which is not requested by the ordering physician. On information and belief, LMC radiologists do not inform such patients that the radiation has not been ordered and the LMC radiologists do not provide such patients the opportunity to forego such radiation.

76. On information and belief, radiation dosages can cause or contribute to cancer with potentially great harm or death to the patient.

77. LMC bills Medicare and Medicaid for x-rays prior to MRI procedures although the ordering physician has not requested a diagnostic x-ray under CPT code 70030.

78. On August 11, 2011, Relator contacted the Wisconsin Physicians Service ("WPS") Medicare Provider Contact Center via phone regarding CMS policy of billing CPT code 70030 and spoke with Barbara Lawrenz, a Provider Relations Research Specialist, who sent the question on to a WPS Medicare Carrier Medical Director ("CMDs") about billing procedure code 70030.

79. Lawrenz responded to Relator:

"Our CMD commented that if the Comprehensive Error Rate Testing ("CERT") contractor reviewed the documentation in the medical record and found there was no order for the x-ray, procedure code 70030, the CERT contractor would consider this an error. The CMD also commented when performing and billing an x-ray (i.e., 70030) without an order and there were no signs or symptoms of metal, Medicare considers this a screening service. As a result, this service is not billable to Medicare."

80. CMS implemented the CERT program to measure improper payments in the Medicare fee-for-service ("FFS") program. CERT is designed to comply with the Improper Payments and Elimination and Recovery Act of 2010 ("IPERA"); Public Law 111-204. CERT

20

measures the error rate for the Medicare claims submitted by providers to carriers and fiscal intermediaries.

81.     On August 16, 2011 in a meeting with Relator, Jill Tom, who initially replaced Wolfgang after Wolfgang was terminated, but has since become an independent contractor for LMC, considered the falsely billed x-rays described above and directed that no action be taken with regard to the prior false claims for such x-ray services.

82.     Also on August 16, 2011, Tom indicated that she will "create a compliance document to state that when a problem is found, per compliance, we will correct the problem from the date it was found going forward."

83.     Despite the said anticipated compliance document described in the above paragraph, LMC has continued to submit false claims for unnecessary x-rays.

84.     On August 16, 2010 Medicare patient P.S. was billed for CPT code 70030 at the rate of $25.30 for a medically unnecessary x-ray prior to an MRI procedure.  This diagnostic test was conducted by the radiologist despite the fact that it had not been requested by the ordering physician and with nothing in the progress note to indicate an order for an orbits x-ray. There was no medical necessity that was shown by the medical questionnaire the patient was asked to fill out by the radiologist.  Despite the lack of medical necessity for the MRI procedure, LMC conducted the procedure with potential harm to the patient and LMC billed Medicare for the unnecessary service provided to P.S.

85.     On August 20, 2010 Medicare patient D.D. was billed for CPT code 70030 at the rate of $25.30 for a medically unnecessary x-ray of the orbits prior to an MRI procedure. This diagnostic test was done without an order from the ordering physician and nothing in the progress note to indicate an x-ray order. There was no medical necessity that was shown by the

medical questionnaire the patient was asked to fill out by the radiologist. Despite the lack of medical necessity for the MRI procedure, LMC billed Medicare for the service provided to D.D.

86.    On September 8, 2010, Medicare patient S.L. was billed for CPT code 70030 at the rate of $25.30 for medically unnecessary x-ray of the orbits prior to an MRI procedure. This diagnostic test was done without an order from the ordering physician and nothing in the progress note to indicate an x-ray order. There was no medical necessity that was shown by the medical questionnaire the patient was asked to fill out by the radiologist. Despite the lack of medical necessity for the MRI procedure, LMC billed Medicare for the service provided to S.L.

87.    LMC has actual knowledge that it billed the state and federal government for x-rays which were not medically necessary. In August 2011, LMC corrected this policy due to steps taken by Relator.  However, LMC's corporate officers are only correcting the fraudulent practice dating back to June 6, 2011 and moving forward and have not taken action to accomplish compliance for past illegal billing, which would substantially reduce corporate profits.

88.    In September 2011 when Relator questioned LMC's compliance officer, Dr. Timothy Buchanan, about returning the funds received from the government in response to the fraudulently billed, medically unnecessary, and medically harmful x-rays, he stated that he did "not care what Medicare says," "I want to get paid for it," and "I am not giving any money back."  Relator possesses recorded verification of Buchanan's statements and directive to defraud the government and retain funds obtained through fraudulent billing.

**Defendant LMC Routinely Bills for Procedures Which are Not Performed**

89.    Under the Medicaid "Vaccines for Children" (VFC) program, providers are entitled to bill under CPT code 99211 for out-patient consultations conducted in conjunction with the administration of vaccines to children.

90. LMC maintains a policy and practice to automatically add CPT code 99211 to the billing to the government for vaccinating children in all situations even though such consultation service is rarely provided.

91. LMC follows its policy to "auto-add" the phantom consultation and to bill the government under CPT code 99211 despite the fact that there is no medical documentation of such consultation because there was no consultation.

92. Relator has personally viewed the implementation and process of the auto-add-on LMC policy and procedure to CPT code 99211 and, for many such vaccinations, she has personally reviewed the related medical document showing that no such consultation was in fact conducted.

93. In 2011, the Medicare Fee Schedule for Wisconsin indicates that CPT code 99211 would be reimbursed for $20.85.

**LMC Falsifies Claims to the Government by Substituting a Credentialed Provider Signature for the Non-Credentialed Provider Who Actually Performed the Service**

94. 42 C.F.R. § 422.204(a)(2)(i) covers provider selection and initial credentialing for physicians. It requires written application, verification of licensure or certification from primary sources, disciplinary status, eligibility for payment under Medicare/Medicaid, and site visits as appropriate. The application must be signed and dated and include an attestation by the applicant of the correctness and completeness of the application and other information submitted in support of the application.

95. Medicare/Medicaid will not reimburse non-credentialed physician assistants ("PA") for certain services provided.

96. Medicare/Medicaid pays for "incident to" services that are billed by physicians but are performed by non-physicians, such as non-credentialed PA's. 42 U.S.C. §

23

1395x(s)(2) *et seq.;* cf. Medicare Carrier's Manual § 2050.1.

97.     Medicare Benefit Policy Manual, Chapter 15, Section 60.1 defines "incident to" a physician's professional services as services or supplies furnished as an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness.

98.     Medicare Benefit Policy Manual, Chapter 15, Section 60.2 states that in order to bill on an "incident-to" basis, "there must have been a direct, personal, professional service furnished by the physician to *initiate the course of treatment* of which the service being performed by the non-physician practitioner is an incidental part, and there must be subsequent services by the physician of a frequency that reflects his/her continuing active participation in and management of the course of treatment."

99.     "Incident-to" coverage allows non-credentialed PA's to bill services under the healthcare provider's National Provider Identifier ("NPI") provided by them to *established* patients with *established* plans of care. LMC regularly submitted claims for non-credentialed PA's services as though they were "incident to" a physician's established plan of care when the service provided was either a *new diagnosis,* and therefore not under an established plan of care, or a *new patient* in violation of Medicare/Medicaid requirements.

100.     Relator has personal knowledge that LMC had and continues to have a policy and practice of billing Medicare/Medicaid for services performed by ineligible providers. Relator has personal knowledge that LMC submits such claims to the government by listing an eligible provider on the claims as having performed such billed service when, in fact, an ineligible provider performed the service.

101.     PA John Vieau became a credentialed healthcare provider on September 25,

24

2009. In at least as far back as 2008 and until September 25, 2009, Vieau provided healthcare independent services to new patients which were not "incident to" a supervising physician's established plan of care. LMC billed Medicare for Vieau's services for patient visits that were outside the scope of what the federal regulations legally allow.

102.    Medicare patient L.A. was first seen at LMC on October 20, 2008. The performing provider listed on the invoice for that date is PA John Vieau. The invoice presented to the government for payment by LMC falsely shows that the provider on that date is Dr. Paul Robey. The CPT code billed for that visit is 99203, which is for a new patient visit. Medicare/Medicaid regulations prohibit LMC from billing for services provided to new patient L.A. that are provided by a non-credentialed PA. LMC billed Medicare for such prohibited services.

103.    Subsequently, Medicare patient L.A. was seen by PA John Vieau on December 22, 2008, January 22, 2009, January 30, 2009, February 13, 2009, April 22, 2009 and May 27, 2009. The invoice used by LMC to obtain payment from Medicare for these visits shows CPT code 99213, a visit for an established patient. Under Medicare/Medicaid regulations, a non-credentialed PA cannot establish a plan of care for a new patient. LMC falsely billed Medicare for "incident to" services provided by PA John Vieau under Dr. Paul Robey for all subsequent visits.

104.    Medicare patient J.S. was seen for a new patient visit, CPT code 99203, by PA John Vieau on February 13, 2009. The invoice which LMC used to obtain payment from the government for that service falsely lists Dr. Paul Robey as the provider.

105.    LMC has actual knowledge that its billing policy of listing credentialed providers on invoices for work provided by non-credentialed providers for non "incident-to" services is fraudulent.

106.    Relator discovered the illegal billing described in the above paragraph during the yearly audits for new providers and brought it to LMC's attention. Based upon Relator's information and belief, LMC has failed to correct its fraudulent billing for which it was paid by the state and/or federal government. Despite LMC's knowledge of Vieau's fraudulent submissions LMC has taken no steps with Medicare/Medicaid to correct the fraudulent billings.

**LMC Falsely Bills the Government for Reciprocal Billing Arrangement Which Do Not Meet Government Criteria**

107.    LMC fraudulently submits claims to Medicare that indicate reciprocal billing arrangements between physicians when, in fact, there was no such arrangement and the performing physician was a "moonlighting" resident. LMC engages in this fraud to obtain full reimbursement for services provided for by the "moonlighting" physician.

108.    Medicare/Medicaid reimburses providers such as LMC for physicians who have reciprocal billing arrangements. Reciprocal billing allows a patient's regular physician to submit a claim and receive the Medicare/Medicaid payment for covered visit services that the regular physician arranges to be provided by a substitute physician on a reciprocal basis.

109.    42 U.S.C. § 1395u (b)(6)(D) promulgates the compliance requirements for billing covered visits on a reciprocal billing arrangement. It states in pertinent part, "payment may be made to a physician for physicians' services . . . furnished by a second physician to patients of the first physician if (i) the first physician is unavailable to provide the services; (ii) the services are furnished pursuant to an arrangement between the two physicians that (I) is informal and reciprocal. . . ."

110.    Medicare Claims Processing Manual, Chapter 1, Section 30.2.10 sets forth the coding requirements to receive payment under reciprocal billing arrangements. In pertinent part, it states, "[c]arriers should inform physicians of the compliance requirements when billing for

26

services of a substitute physician. The physician notification should state that, in entering the Q5 modifier, the regular physician . . . is certifying that the services are covered visit services furnished by the substitute physician identified in a record or the regular physician which is available for inspection, and are services for which the regular physician (or group) is entitled to submit the claim."

111.    Moonlighting is defined as any activity, outside the requirements of the residency program, in which an individual performs duties as a fully-licensed physician and receives direct financial remuneration, 42 C.F.R. § 415.208(a) described "services of moonlighting residents" as "services that licensed residents perform that are outside the scope of an approved [Graduate Medical Education] program."

112.    The services of "moonlighting" residents and fellows may be billed as physician services only if specific criteria are met. 42 C.F.R. § 415.206(b)(1) provides that "services furnished by a resident in a non-providers setting are covered as physician services and payable under the physician fee schedule if the following requirements are met: (i) [t]he resident is fully licensed to practice medicine . . . in the State in which the service is performed; and (ii) [t]he time spent in patient care activities in the non-provider setting is not included in a teaching hospital's full-time equivalency resident count for the purpose of direct GME payments."

113.    Medicare Claims Processing Manual, Chapter 15, Section 30.3.B also covers moonlighting, defined as, "services furnished by interns and residents outside the scope of an approved training program." The services are covered as physician services where the following requirements are met: 1) the services are identifiable physician services, the nature of which requires performance by a physician in person and which contribute to the diagnosis or treatment of the patient's condition; and 2) the intern or resident is fully licensed to practice medicine,

27

osteopathy, dentistry, or podiatry by the State in which the services are performed. When these criteria are met, the services are considered to have been furnished by the individuals in their capacity as physicians and not in their capacity as interns and residents.

114.    Relator has personal knowledge of LMC's practice of fraudulent billing for services of moonlighting physicians. Relator informed Jill Tom, LMC Independent Coding/Auditing Consultant, of the fraudulent billing. Tom instructed Relator to only correct past coding to November 1, 2010. All fraudulently submitted claims made prior to November 1, 2010 have not been corrected by LMC because Tom directed Relator not to correct or refund such funds received in response to such fraudulent billing.

115.    LMC hired Dr. Parmar as a moonlighting physician. On July 10, 2010, Dr. Parmar saw Medicare patient M.M. The invoice provides proof that LMC fraudulently submitted a claim to Medicare that indicated the services provided by Dr. Parmar were under a reciprocal billing arrangement with Dr. Thota, when, in fact, no reciprocal billing arrangement existed. The invoice should have made clear that Dr. Parma was seeing the patient as a "moonlighting" physician, not as part of a reciprocal billing arrangement as indicated by the Q5 Modifier on the invoice.

116.    On July 31, 2010, Dr. Parmar saw Medicare patient B.C. The invoice provides proof that LMC fraudulently submitted a claim to Medicare that indicated the services provided by Dr. Parmar were under a reciprocal billing arrangement with Dr. Thota, when, in fact, no reciprocal billing arrangement existed. The invoice should have made clear that Dr. Parma was seeing the patient as a "moonlighting" physician, not as part of a reciprocal billing arrangement as indicated by the Q5 Modifier on the invoice.

117.    On information and belief, LMC actively participated in the fraudulent billing of

28

moonlighting physicians as having reciprocal billing arrangements with LMC providers. When Relator discovered the fraudulent practice, LMC prohibited her from correcting past fraudulent billings in this category, except to go back to just November 1, 2010 and no earlier.

**LMC has Conspired to Retain Fraudulently Obtained Medicare/Medicaid Reimbursement by Implementing a Policy of Correcting Fraudulent Billing Only from the Date the Fraudulent Billing Practice is "Uncovered" by Relator, But Not Retroactively**

118.    As described, *supra*, Defendant LMC's Central Business and the Compliance Committee have agreed to only correct violations back to the date of the initial "discovery" of any illegal billing practices and to allow knowingly false claims to remain unchanged in order to keep the illegally obtained Medicare and/or Medicaid reimbursements.

119.    In fact, such "discovery" date is the date that the Relator brings the false claims practice to management's attention, although management is well aware of its practices well before Relator's "discovery."

120.    On August 17, 2011, LMC's Senior Vice President, Elizabeth Ojeda, proposed P&P #1106 "Timeline for Coding & Billing Errors" which states that when a coding error is explicitly brought to management's attention "LMC staff will go back to the date when the error was discovered and rectify (i.e. charge correction, voluntary refunds, etc.) claims as needed."

121.    As of October 11, 2011, and on information and belief continuing through the present, the proposed policy set forth in paragraph 119 above, has not yet been implemented and remains merely a proposal.

122.    LMC prohibits Relator or other staff from correcting or researching claims without management approval.

**LMC Fraudulently Billed Screening Pap Smears as Medically Necessary Diagnostic Pap Smears in Order to Receive Reimbursement from Medicare**

123.    Medicare pays for screening pap smears (42 U.S.C. § 1395x(nn)(1) ), but  only on

29

annual basis. 42 U.S.C. § 1395y(a)(1)(F)

124.    Medicare covers diagnostic pap smears when they are ordered by a physician under one of several conditions. If the pap smear is not covered by one of these conditions, it is considered only a screening, and, as such, not covered under Medicare. Medicare Manual 190.2 Diagnostic Pap Smears.

125.    LMC billed to and received payment from Medicare for screening pap smears in excess of annual screening, by "up-coding" such screening pap smears and billing them to the government as diagnostic screening pap smears, using CPT Q0091.

126.    LMC billed for every single pap collection, billing one annually as a screening pap smear and billing all other screening pap smears as diagnostic screening pap smears, using CPT Q0091.

127.    LMC Coding Department Internal Process dated September 8, 2008, states the following: "Pap smear (88164) and Thin Prep (88175) are not billed in office encounters. When these services are indicated by a provider, cross off and replace with 99000. If either service is performed on a Medicare patient, the Q0091 is to be indicated."

128.    The September 8, 2008 Coding Department Internal Process does not comply with Medicare regulations regarding pap smear billing.

129.    Relator had LMC policy changed on April 8, 2011 only after multiple attempts by LMC to continue policy.

130.    LMC Coding Department Internal Process dated April 8, 2011 no longer contains the direction to code any pap smears for Medicare patients with a Q0091 code.

131.    In accordance with LMC policy, none of the fraudulent Medicare bills prior to April 8, 2011 were corrected.

30

132.    In 2011, the Medicare Fee Schedule allows reimbursement for CPT code Q0091 in the amount of $45.82.

**LMC Fraudulently Unbundles Global Surgical Package Bills in Order to Manipulate Coding and Maximize Medicare Reimbursement in Violation of Federal Regulations**

133.    Under the global billing system, the Medicare program reimburses physicians for surgical procedures under codes which are intended to reimburse not only for the surgery itself but also for certain pre-operative, intra-operative, and post-operative services that are related to the surgery.  42 C.F.R. § 414.40(b)(1).

134.    Components of a Global Surgical Package, as set forth in CMS 100.4 § 40.1.A, include "preoperative visits".  To be eligible for Medicare reimbursement, such visits must take place after the decision is made to operate and must be held during the period commencing with the day before the day of the surgery for major procedures.

135.    If a visit is part of a Global Surgical Package, Medicare includes one related E/M encounter on the day prior to or on the day of surgery, including history and physical.

136.    Relator has educated LMC Providers regarding the Medicare regulation and coding procedure of a Global Surgical Package.

137.    LMC Providers bill preoperative visits as CPT 99213, an evaluation and management visit in violation of federal regulations.  These visits are included as part of the Global Surgical Package.

138.    Relator has educated LMC Provider, Dr. Jonathan Berry, numerous times regarding this Medicare policy.

139.    On information and belief, Dr. Berry, as well as other LMC providers, continues to bill preoperative visits as CPT 99213 even though the intent of the visit is to be a preoperative visit after the decision has been made to operate.

31

140.    In 2011, the Medicare Fee Schedule indicates Medicare reimbursement for CPT code 99213 to be $72.42.

**LMC Providers Fraudulently Unbundled Follow-Up Ultrasounds from Endovenous Laser Treatments in Order to Manipulate Coding and Maximize Medicare Reimbursement**

141.    Following an endovenous laser treatment ("EVLT"), LMC Providers perform limited duplex ultrasounds.

142.    Per Medicare regulations, limited duplex ultrasound scans are included in the EVLT procedure CPT 36478.

143.    In accordance with LMC P & P Reference # 578 regarding EVLT and Sclerotherapy Services dated January 24, 2005, LMC Providers billed limited duplex scans as CPT 76970 in addition to CPT 93971.

144.    LMC instructed providers to bill CPT 76970 instead of 93971 because 93971 was included in CPT 36478 and 36479. This fraudulent scheme allowed LMC to receive remuneration for a procedure that was to be bundled with another and billing an unlisted code.

145.    In 2011, the Medicare Fee Schedule indicates Medicare reimbursement for CPT code 76790 to be $86.73.

146.    Relator changed LMC P & P Reference # 578 regarding EVLT and Sclerotherapy Services on May 13, 2011 to indicate that limited duplex scans were part of the EVLT treatments and could not be billed separately.

147.    From at least January 24, 2005, through May 13, 2011, LMC fraudulently billed Medicare knowingly withheld identified overpayment.

148.    On information and belief, Dr. Sabatino performed an average of twenty (20) procedures per month.

149.    Per LMC policy, no fraudulent Medicare bills prior to Relator's correcting policy

32

were adjusted.

**LMC Providers Fail to Follow Federal Regulation Regarding Medicare Signature Requirements Resulting in False Claims Presented to Medicare for Reimbursement**

150.     Medicare regulations require that the treating physician's signature be present in the documentation associated with all services submitted to Medicare.  CMS Internet Only Manual 100-08, Chapter 3, § 3.3.2.4.

151.     Medicare requires that the signature be a legible identifier for the service.  CMS Internet Only Manual 100-08, Chapter 3, § 3.3.2.4.

152.     They provider's signature can be in the form of either a handwritten signature or an electronic signature.  Stamped signatures are not acceptable signatures.  CMS Internet Only Manual 100-08, Chapter 3, § 3.3.2.4.

153.     On August 7, 2010, Joan Wolfgang informed Dr. Frank LaVora that he had submitted documentation with a stamped signature in violation of Medicare regulation.

154.     On information and belief, Dr. LaVora did not correct the previously submitted billing with stamped signatures.  Therefore those bills submitted remain false claims by Defendant.

155.     On October 18, 2010, Relator emailed Dr. Frank LaVora for his continuous violation of Medicare signature requirement regarding using a stamped signature.

156.     On information and belief, LMC Providers use stamped signatures even though Relator has educated the providers numerous times that Medicare regulations prohibit stamped signatures.

**LMC Providers Performed Gang Visits at Nursing Homes Leading to Fraudulent Billing Because Such Initial Visit/Admissions Must be Performed by a Physician**

157.     Medicare requires that a physician perform the initial admission and initial visit of a patient being admitted or readmitted to a Skilled Nursing Facility ("SNF") or Long Term Care

33

Facility.  42 C.F.R. § 483.40(c)(4).

158.  A physician may not delegate the initial visit in a SNF to a non-physician provider. 42 C.F.R. §§ 483,40(c)(4) & (e)(2).

159.  The initial visit is defined as the initial comprehensive visit during which the physician completes a thorough assessment, develops a plan of care, and writes or verifies orders for the nursing facility resident.

160.  In order to receive payment for a readmission to a SNF, a physician must perform the readmission.  A physician may not delegate the readmission in a SNF to a non-physician provider. CMS Internet Only Manual, Chapter 12, § 30.6.13.

161.  LMC providers conduct patient visits at nursing home once every thirty (30) days regardless of medical necessity.  These "gang visits" result in claims for an unreasonable number of daily E/M visits by the same physician/s to multiple residents at a facility within a twenty-four (24) hour period regardless of medical necessity.  *See* CMS Internet Only Manual, Chapter 12, § 30.6.13(G); Center for Medicare and Medicaid Services, *Medicare Learning Network,* Matter Number: MM4246 (January 6, 2006).

162.  If a patient is not seen for their initial visit or their initial readmission visit during this one (1) day, LMC providers do not provide an initial comprehensive visit.

163.  The use of gang visits by LMC providers results in patients not receiving initial comprehensive visits from LMC providers.

164.  The use of gang visits by LMC providers results in patients being readmitted by non-physician practitioners who are not eligible for reimbursement under Medicare regulations. *See* 42 C.F.R. § 483.40.

165.  These E/M visits are being billed as a service for an existing patient on a plan of

34

care when no plan of care has been established due to the lack of an initial comprehensive examination by an LMC provider.

166.    Prior to May 19, 2011, LMC non-physician practitioners, Ms. Karen Wasiullah and Ms. Mary Muth, reported to Relator that LMC providers were not performing initial comprehensive visits as required by Medicare for patients who were readmitted to SNF after inpatient treatment at hospitals.  Instead, LMC providers assigned non-physician practitioners to perform the readmission initial visits.

167.    An August 31, 2011, email from Relator to Jill Tom requested that LMC start auditing nursing home and hospital charges.  Upon information and belief no such audit has occurred.

**LMC Falsely Bills Medicare for Home Visit Services Provided to Patients without Medical Necessity**

168.    LMC providers order non-physician practitioners to provide home care visits to patients without medical necessity in violation of Medicare regulations.

169.    Home visits are described as a visit to a patient at a private residence.  CMS Internet Only Manual, Chapter 12, § 30.6.14.1.

170.    There must be a well-documented reason that the patient is being seen in the home and not in the provider's office.  The service cannot be merely for the beneficiary convenience. CMS Internet Only Manual, Chapter 12, § 30.6.14 – 30.6.14.1; Medicare Local Coverage Determination: L31613.

171.    If the provider is only rendering care for a limited condition, the service will be presumed not medically necessary, unless the provider of record requests a consultation and care is medically necessary and clearly documented in the medical record. Medicare Local Coverage Determination: L31613.

35

172.    LMC P & P Reference # 1037 regarding Home Visit Billing states, in part, "beneficiaries seen may have chronic conditions, may be disabled either physically or mentally making access to a traditional office visit very difficult" and "it must be documented in the medical record the medical necessity of the home visit in lieu of an office visit."

173.    LMC non-physician practitioners have told Relator that they were being directed by LMC providers to bill for home visits for patients who did not qualify under Medicare or LMC policy for home visits as the patients did not have difficulty coming to the provider's offices and therefore were not medically necessary.

174.    Medicare prohibits payment for home visits that overlap with services provided by home health agencies.  CMS Internet Only Manual, Chapter 12, § 30.6.14.

175.    Dr. Wasiullah instituted a LMC program whereby nurse practitioners would perform a home visit on a patient discharged from the hospital within forty-eight (48) hours of the discharge, even if those patients were also being seen by home health agencies.

176.    On June 15, 2011, Relator presented a power-point presentation to address when and how home service visits were billable in accordance with Dr. Wasiullah's program.

177.    Several nurse practitioners who attended Relator's presentation had concerns that the home visits should not be billed if Dr. Wasiullah's program was implemented.

178.    Relator received emails from nurse practitioners following the implementation of the program stating that the nurse practitioners did not believe their visit qualified as a billable home visit.

179.    Relator was terminated by Defendant in retaliation for her investigation into LMC's false billing practices prior to being able to obtain documentation showing this fraudulent behavior.

180.    On information and belief, these home visits were not medically necessary and

were fraudulently billed to Medicare.

**LMC Fraudulently Billed Medicare for Services Performed by Students in Violation of Medicare Regulations**

181. Medicare will pay for physician provider services provided in teaching settings using the physician fee schedule occurs only if certain documentation has been properly filled out by the provider. 42 C.F.R. § 415.170.

182. For Medicare to pay for services when a provider is supervising a student, the provider must document the CC, HPI, Exam, and Medical Decision Making. 42 C.F.R. § 415.172.

183. An LMC Coding News Flash dated May 6, 2010, sets forth the proper documentation required when supervising a student in accordance with 42 C.F.R. § 415.172.

184. Dr. Rosner is an LMC provider who spoke with Relator regarding the requirements of billing when using residents. In 2011, Dr. Rosner admitted to using students for years when seeing patients at St. Joe's Hospital and not correctly documenting it.

185. Dr. Rosner also stated to Relator that Dr. Sauter used students when seeing patients at St. Joe's Hospital and not correctly documenting it.

186. Relator reviewed Dr. Rosner's medical documentation the week of October 3, 2011, and found that the documentation did not properly follow Medicare regulations.

187. In a March 15, 2010, email to Dr. Kiyono, Relator set forth the Medicare documentation requirements for supervising a student in accordance with 42 C.F.R. § 415.170.

188. Relator was told by Dr. Buchanan that a decision had been made to go back one calendar year and have Drs. Rosner and Sauter correct their documentation.

189. Upon information and belief, knowingly false bills were not corrected by LMC for billing that was not supported by proper medical documentation prior to 2010.

**LMC Retaliated Against Relator for Trying to Address LMC's Fraudulent Billing Practices**

37

190.    In a July 12, 2011 Memorandum from Ojeda to Relator titled "EK "Boundaries" Memo, Relator was instructed to no longer "dig[] up" problems. Specifically, Relator is told "[a]s a coding manager at LMC, your role is to 'manage' the work flow and accuracy of what the coders on the floor are processing, not to focus on what new issues you can find to "correct" while over forty (40) thousand encounters are being worked and coding denials are being received."

191.    As set forth above, Relator called to the attention of LMC violations of law governing false claims on a number of occasions and was dissuaded, deterred and directed not to make LMC compliant with federal regulations.

192.    As part of this retaliation, in a June 17, 2011, memorandum regarding "Weekly Meetings with Jill Tom", Relator was instructed that she would have phone conferences every Tuesday and Friday with consultant Jill Tom to discuss "where the existing policies within the organization have come from."

193.    LMC Human Resources Director, Ms. Mary Donovan told Relator that her employment situation was "not working" and that it was not just "Ojeda's decision" she also spoke to members of the "CBO committees" and Physician Shareholders.  Ms. Donovan indicated that the people she spoke with stated that they were not getting timely responses from Relator.

194.    Relator had never previously received any complaints in regards to her not giving timely responses to providers.

195.    LMC was aware of Relator's investigation because, *inter alia*: (a) on numerous occasions, Relator informed her supervisor and LMC vice-president Ms. Elizabeth Ojeda that LMC was not compliant with regulations, and that policies needed to be put in place to become compliant with regulations; (b) Relator brought her questions to WPS for clarification and was still

38

not allowed to implement policies that would correct LMC's fraudulent billing practices; and (c) Relator accessed and printed numerous documents showing noncompliance with federal regulations and would leave the building with them.

## FIRST CAUSE OF ACTION
**Defendant Violated the False Claims Act – 31 U.S.C. § 3729(a)(1)(A) by Fraudulently Presenting False Claims for Remuneration from Medicare Including: Up-coding Levels of Service for E/M Services; Fraudulently Billing Medically Unnecessary Procedures; Fraudulently Billing for Services Never Performed; and Otherwise Failing to Follow Established Billing and Coding Guidelines in Violation of State and Federal Laws and Regulations**

196. Relator reasserts and incorporates by reference the allegations of all previous paragraphs as if restated herein.

197. By its action and inaction described above, Defendant knowingly presented or caused to be presented to the United States false or fraudulent Medicare and/or Medicaid claims for payment or approval, in violation of the False Claims Act, as amended, 31 U.S.C. § 3729(a)(1)(A); that is, Defendant knowingly made or presented, or caused to be made or presented, to the United States claims for payment for services which were false, in that the services claimed were not medically necessary or otherwise did not qualify for reimbursement under the Medicare or Medicaid programs.

198. The United States has been damaged by all of the aforementioned illegal actions in an as of yet undetermined amount. With respect to the aforementioned failures to disclose and illegal activities, Defendant knowingly made false claims to officials of the United States for the purpose of obtaining compensation to which it was not otherwise entitled.

## SECOND CAUSE OF ACTION
**Defendant Violated the False Claims Act — 31 U.S.C. § 3729(a)(1)(B) by Submitting False Claim Forms for Remuneration from Medicare and Medicaid including: Forms that Billed Higher Levels of E/M Services than Those Provided; Fraudulently Billing Medically Unnecessary procedures; and Otherwise Failing to Follow Established Billing and Coding Guidelines in Violation of State and Federal Laws and Regulations**

39

199.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

200.     By its actions and inactions described above, Defendant knowingly made or used a false record or statement to get a false or fraudulent Medicare and Medicaid claim paid or approved by the United States, in violation of the False Claims Act, as amended, 31 U.S.C. § 3729(a)(1)(B); that is, Defendant knowingly made or used or caused to be made or used false Medicare and Medicaid claim forms and supporting materials, such as internal billing forms, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicare and Medicaid claims paid or approved by the United States, in that the services claimed for were not medically necessary or otherwise did not qualify for reimbursement under the Medicare or Medicaid programs.

201.     The United States of America has been damaged by all of the aforementioned illegal actions in an as of yet undetermined amount. With respect to the aforementioned failures to disclose and illegal activities, Defendant knowingly made false claims to officials of the United States for the purpose of obtaining compensation to which it was not otherwise entitled.

### THIRD CAUSE OF ACTION
**Defendant Violated False Claims Act — 31 U.S.C. 3729(a)(1)(C)) by Putting in Place Policies that Allow Healthcare Providers to Fraudulently Bill Higher Level of E/M Services than Were Provided, Policies that Prevented Reviewing the Levels of Service for Accuracy., and Policies that Insured that Fraudulently Obtained Medicare/Medicaid Reimbursements would not be Corrected Retroactively**

202.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

203.     By its actions and inactions described above, Defendant knowingly conspired with its healthcare providers to submit false or fraudulent statement of levels of E/M services in

40

order to allow Defendant to submit claims for payment to the United States, in violation of the False Claims Act, as amended, 31 U.S.C. § 3729(0)(1)(A) and (B).

204.    By its actions and inactions described above, Defendant LMC's Central Business Office conspired to retain fraudulent Medicare/Medicaid reimbursements, which are legally required to be repaid to the United States, by instituting a policy that only corrects claims submitted from the date the illegal billing practice is uncovered by Relator, in violation of the False Claims Act, as amended, 31 U.S.C. § 3729(0)(1)(C).

205.    The United States of America has been damaged by all of the aforementioned illegal actions in an as of yet undetermined amount. With respect to the aforementioned failures to disclose and illegal activities, Defendant knowingly made false claims to officials of the United States for the purpose of obtaining compensation to which it was not otherwise entitled.

## FOURTH CAUSE OF ACTION
## LMC Violated False Claims Act — 31 U.S.C. 3729(a)(1)(G)) by Creating Policies that Ensure that Medicare is Not Refunded Money for Knowingly Fraudulent Claims

206.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

207.    By its actions and inactions described above, Defendant has received funds from the United States for knowingly false claims and has failed to return those funds, despite a legal obligation to repay said funds, in violation of the False Claims Act, as amended, 31 U.S.C. § 3729(a)(1)(G).

208.    The United States of America has been damaged by all of the aforementioned illegal actions in an as of yet undetermined amount. With respect to the aforementioned failures to disclose and illegal activities, Defendant knowingly made false claims to officials of the

41

United States for the purpose of retaining compensation to which it was not otherwise entitled.

## FIFTH CAUSE OF ACTION
**Unlawful Retaliation and Conduct under Federal 31 U.S.C. § 3730(h): Unlawful Retaliation Against Relator**

209.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

210.     31 U.S.C. § 3730(h), provides, "(1) Any employee . . . shall be entitled to all relief necessary to make that employee . . whole, if that employee . . discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by employee. . . . in furtherance of, other efforts to stop one or more violations of this subchapters."

211.     LMC discharged Relator because of her lawful conduct in furtherance of her efforts to stop LMC from violating federal requirements for submission of claims to the government. Relator has been damaged by LMC's conduct to discharge her employment in an amount as of yet undetermined, but specifically including loss of income and benefits and damage to her career.

## SIXTH CAUSE OF ACTION
**Defendant Violated Wis. Stat. § 20.931(2)(a) by Fraudulently Presenting False Claims for Remuneration from Medicaid Including: Upcoding Levels of Service for E/M Services; Fraudulently Billing Medically Unnecessary procedures; and Otherwise Failing to Follow Established Billing and Coding Guidelines in Violation of State and Federal Laws and Regulations**

212.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

213.     By its actions and inactions described above, Defendant knowingly presented or caused to be presented to the State of Wisconsin false or fraudulent Medicaid claims for payment or approval, in violation of Wis. Stat. § 20.931(2)(a); that is, Defendant knowingly made or presented, or caused to be made or presented, to the State of Wisconsin claims for payment for

42

medical assistance which were false, in that the services claimed for were not medically necessary or otherwise did not qualify for reimbursement under the Medicaid programs.

214. The State of Wisconsin has been damaged by all of the aforementioned illegal actions in an as of yet undetermined amount. With respect to the aforementioned failures to disclose and illegal activities, Defendant knowingly made false claims to officials of the State of Wisconsin for the purpose of obtaining compensation to which it was not otherwise entitled.

**SEVENTH CAUSE OF ACTION**
**Defendant Violated Wis. Stat. § 20.931(2)(b) by Submitting False Claim Forms for Remuneration from Medicaid including: Forms that Billed Higher Levels of E/M Services than Those Provided; Fraudulently Billing Medically Unnecessary Procedures and Otherwise Failing to Follow Established Billing and Coding Guidelines in Violation of State and Federal Laws and Regulations**

215. Relator re-alleges and incorporates by reference all paragraphs set forth above as if restated herein.

216. By its actions and inactions described above, Defendant knowingly made or used a false record or statement to get a false claim for medical assistance paid or approved by the State of Wisconsin, in violation of Wis. Stat. §20.931(2)(b) that is, Defendant knowingly made or used or caused to be made or used false Medicaid claim forms and supporting materials, such as internal billing forms, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicaid claims paid or approved by the State of Wisconsin, in that the services claimed for were not medically necessary or otherwise did not qualify for reimbursement under the Medicare or Medicaid programs.

217. The State of Wisconsin has been damaged by all of the aforementioned illegal actions in an as of yet undetermined amount. With respect to the aforementioned failures to disclose and illegal activities, Defendant knowingly made false claims to officials of the State of Wisconsin for the purpose of obtaining compensation to which it was not otherwise entitled.

43

## EIGHTH CAUSE OF ACTION
**Defendant Violated Wis. Stat. § 20.931 by Putting in Place Policies that Allowed Healthcare Providers to Fraudulently Bill Higher Level of E/M Services than were Provided, Policies that Prevented Reviewing the Levels of Service for Accuracy, and Policies that Insured that Fraudulently Obtained Medicare/Medicaid Reimbursements would not be Corrected Retroactively**

218.    Relator re-alleges and incorporates by reference all paragraphs set forth above as if restated herein.

219.    By its actions and inactions described above, Defendant conspired with its employees to submit false or fraudulent statement of services performed in order to allow Defendant to submit claims for payment to the State of Wisconsin, in violation of Wis. Stat. §§20.931(2)(a) and (b).

220.    By its actions and inactions described above, Defendant LMC's Central Business Office conspired to retain fraudulent Medicare/Medicaid reimbursements by instituting a policy that only corrects claims submitted from the date the illegal billing practice is uncovered by Relator in violation of Wis. Stat. § 20.931(2)(h).

221.    The State of Wisconsin has been damaged by all of the aforementioned illegal actions in an as of yet undetermined amount. With respect to the aforementioned failures to disclose and illegal activities, Defendant knowingly made false claims to officials of the State of Wisconsin for the purpose of obtaining compensation to which it was not otherwise entitled.

## NINTH CAUSE OF ACTION
**Defendant Violated Wis. Stat. § 20.931(2)(h) by Creating Policies that Ensure that Medicaid is Not Refunded Money for Knowingly Fraudulent Claims**

222.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

223.    By its actions and inactions described above, Defendant has received funds from the State of Wisconsin for knowingly false claims and has failed to return those funds in

44

violation of Wis. Stat. §20.931.

224. The State of Wisconsin has been damaged by all of the aforementioned illegal actions in an as of yet undetermined amount. With respect to the aforementioned failures to disclose and illegal activities, Defendant knowingly made false claims to officials of the State of Wisconsin for the purpose of obtaining compensation to which it was not otherwise entitled.

## TENTH CAUSE OF ACTION
### Defendant Violated Wis. Stat. § 20.931(14) When Defendant Retaliated Against Relator for Reporting Defendant's Illegal Conduct by Terminating Her

225. Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

226. Wis. Stat. § 20.931(14) states, in part, "[a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against by his or her employer because of lawful actions taken by the employee . . .in furtherance of an action or claim filed under this section . . . is entitled to all necessary relief to make the employee whole."

227. LMC discharged Relator because of her lawful conduct in furtherance of her efforts to stop LMC from violating federal requirements for submission of claims to the government. Relator has been damaged by LMC's conduct to discharge her employment in an amount as of yet undetermined, but specifically including loss of income and benefits and damage to her career.

## PRAYER FOR RELIEF

WHEREFORE, the United States and State of Wisconsin are entitled to damages from Defendant in accordance with the provisions of 31 U.S.C. §§ 3729-3733 and Wis. Stat. §20.931, and Plaintiff/Relator requests that judgment be entered against Defendant, ordering that:

a. Defendant cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

45

b. Defendant pay an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty against Defendant of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c. Plaintiff/Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) as her Relator Share;

d. Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

e. Plaintiff/Relator be awarded such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act;

f. The United States and Plaintiff/Relator be granted all such other relief as the Court deems just and proper.

g. Defendant cease and desist from violating Wis. Stat. §20.931;

h. Defendant pay an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendant's actions, plus a civil penalty against Defendant of not less than $5,000 and not more than $10,000 for each violation pursuant to Wis. Stat §20.931(2);

i. Plaintiff/Relator be awarded the maximum amount allowed pursuant to Wis. Stat. §20.931(11) as her Relator Share;

j. Plaintiff/Relator be awarded relief pursuant to Wis. Stat. § 20.931(14) for retaliatory discharge including back pay, potential front pay, reinstatement, attorneys' fees and compensatory and punitive damages.

k. Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to Wis. Stat. §20.931(11);

46

l.  The State of Wisconsin and Plaintiff/Relator be granted all such other relief as the

Court deems just and proper.

PLEASE TAKE NOTICE THAT THE PLAINTIFF DEMANDS THE ABOVE ENTITLED
ACTION TO BE TRIED TO A 12 PERSON JURY.

Respectfully submitted and dated this _23rd_ day of May, 2012.

Cross Law Firm, S.C.
Attorneys for Relator Elizabeth Keltner

By:___s/Noah Reinstein_____
Nola J. Hitchcock Cross
Wisconsin State Bar Number: 1015817
Noah Reinstein
Wisconsin State Bar Number: 1056754

Lawyer's Building
845 North 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax: (414) 273-7055
njhcross@crosslawfirm.com
nreinstein@crosslawfirm.com

47