# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA and
STATE OF WISCONSIN ex rel.
ELIZABETH KELTNER,
           Plaintiffs/Relator,

      v.                               Case No. 11-CV-00892

LAKESHORE MEDICAL CLINIC, LTD.,
           Defendant.

---

## DECISION AND ORDER

Relator Elizabeth Keltner brings this action on behalf of the United States and the State of Wisconsin pursuant to the *qui tam* provisions of the false Claims Act ("FCA"), 31 U.S.C. § 3730(b), and the Wisconsin False Claims Act ("Wisconsin FCA"), Wis. Stat. § 20.931(5). Defendant Lakeshore Medical Clinic, Ltd. is a multi-specialty medical group based in Milwaukee that employs over 100 physicians. Relator worked in defendant's billing department from February 13, 2006 until defendant terminated her on October 11, 2011. Relator alleges that defendant filed fraudulent claims for reimbursement from Medicare and Medicaid. She also alleges that defendant discharged her in retaliation for her attempts to remedy defendant's fraudulent billing practices. The United States and the State of Wisconsin declined to intervene in this action, and relator continues it as is her right. Before me now is defendant's motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).

Under the FCA, an individual acting as a relator can bring a civil action on behalf of the United States against a defendant who "knowingly" submits a false claim for payment

to the federal government, 31 U.S.C. § 3729(a)(1)(A), or "knowingly" makes a false statement in support of a claim for payment, *id.* § 3729(a)(1)(B). *See also id.* § 3729(a)(1)(C) (making it illegal to conspire to submit a fraudulent claim or to make a fraudulent statement in support of a claim). A false claim or statement is "knowingly" submitted if a defendant has "actual knowledge" that the claim or statement is false, acts "in deliberate ignorance of the truth" or "in reckless disregard of the truth." 31 U.S.C. § 3729(b)(1); *see also U.S. ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 742 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009).

A relator can also sue under the FCA if a defendant intentionally avoids an obligation to pay the government. This is known as a reverse false claim. Prior to May 20, 2009, the FCA barred "knowingly mak[ing], us[ing], or caus[ing] to be made or used a false record or statement" to conceal an obligation to pay the government. 31 U.S.C. § 3729(a)(7) (2006). On that date, Congress enacted the Fraud Enforcement and Recovery Act ("FERA"), broadening the statute by prohibiting "knowingly and improperly avoid[ing] . . . an obligation to pay" the government without making a false statement to conceal the obligation. *See U.S. ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 836 n.16 (7th Cir. 2011) (quoting and discussing current 31 U.S.C. § 3729(a)(1)(G)); *see also U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir. 2009). The FERA also defines "obligation" to include a duty to pay the government arising "from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). The FCA is implicated in the present case because Medicare and Medicaid are programs funded by the federal

government. Medicare is funded solely by the federal government while Medicaid is funded jointly by the federal and state governments.

The Wisconsin legislature enacted the Wisconsin FCA in 2007. It is similar to the pre-FERA version of the FCA except that it applies only to fraud involving the state Medicaid program. The statute authorizes a relator to bring an action on behalf of the State against a defendant who submits a fraudulent claim for a Medicaid payment, Wis. Stat. § 20.931(2)(a)–(c), or makes a fraudulent statement to conceal an obligation to pay money to Medicaid. Wis. Stat. § 20.931(2)(g).

To survive defendant's Rule 12(b)(6) motion, relator must state a plausible claim for relief that permits "the reasonable inference that defendant is liable for the injury alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering the motion, I take all reasonable inferences in relator's favor. To survive defendant's Rule 9(b) motion, relator must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also U.S. ex rel. Gross v. AIDS Research-Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) ("The FCA is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of [Rule 9(b)]."). In order to plead fraud with "particularity," the complaint must identify the "who, what, when, where, and how" of the alleged fraud. *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003) (quoting *Dileo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). The complaint need not "exclude all possibility of honesty," but it must "show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *Lusby*, 570 F.3d at 854–55. Where some of the facts surrounding the alleged

fraud are outside a relator's control, a relator can plead fraud based on information and belief as long as she offers plausible grounds for suspecting that the defendant has engaged in fraud. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442–43 (7th Cir. 2011); *see also Lusby*, 570 F.3d at 854 (finding that a relator's complaint supported a plausible inference of fraud).

## I. Alleged Fraudulent Claims Involving Evaluation and Management Services

### A. Overbilling

Relator's first claim is that defendant overbilled Medicare and Medicaid for evaluation and management ("E/M") services. E/M services are consultation services provided by a physician to a patient during an office visit or upon admission to a hospital. The Centers for Medicare and Medicaid Services ("CMS") employ codes categorizing reimbursable physician services known as "Current Procedural Terminology" codes ("CPT codes"). There are five levels of CPT codes for E/M services provided to new patients (CPT codes 99211–99215) and existing patients (CPT codes 99201–99205) during office visits and three levels of CPT codes for E/M services provided upon a hospital admission (CPT codes 99221–99223). Each CPT code is worth a predetermined amount of money. For example, if a healthcare provider submits a Medicare or Medicaid claim for an E/M service using CPT 99211, the government will pay the healthcare provider $19.71. The appropriate E/M code for a consultation depends on the complexity of the medical decisions made, the severity of the health-related issues addressed and the time spent with the patient.

4

The complaint alleges that physicians employed by defendant select the appropriate CPT code for a service and submit a claim form to coders in the billing department. The coders then transmit the forms to the government for payment. Coders, generally, do not review the medical documentation to determine if it supports the selected CPT code. However, defendant formerly has used two procedures to randomly review physician claims for E/M services. From 2002 to 2010, defendant annually audited each of its physicians by randomly selecting 25 patient consultations and reviewing the medical documentation to see if it supported the CPT code selected. From January 2010 to January 2011, defendant also reviewed the medical documentation for all E/M services billed under CPT codes 99215 and 99205 ("Level 5 services"). Relator alleges that these procedures revealed that some physicians were "upcoding," i.e. selecting higher CPT codes than were warranted. Relator alleges that the annual audits regularly revealed instances of upcoding, and that the 2009 audit indicated that two physicians had upcoding error rates greater than 10%. Auditors found that Dr. George Cherayil had upcoded 7 of 25 consultations and Dr. John Obudzinski 13 of 25.[1] Relator also alleges that as a result of audits of Level 5 services in 2010 defendant conducted 98 billing education sessions with physicians as compared to 63 in 2009, and that she personally conducted sessions with doctors who had upcoded at least four consultations.

Relator further alleges that defendant failed to explore non-audited consultations to

---

[1]Relator actually claims that 13 physicians had error rates over 10% for one year between 2006 and 2011. However, the audits referenced in the complaint indicate that most of the errors in question were the result of undercoding, not upcoding. *See 188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 735 (7th Cir. 2001) (documents referred to in the complaint and central to the claim can be considered when ruling on a motion to dismiss).

5

determine if they were properly billed. If an audit showed an error rate over 10%, defendant would notify the physician of the correct codes for the audited consultations based on the available medical documentation. If the physician did not submit additional documentation, defendant would bill the consultation at the level indicated by the auditor. Defendant would then wait a year to check in with the physician again. Thus, defendant did not review Dr. Cherayil's and Dr. Obudzinski's non-audited consultations in 2009. And relator alleges that in January 2011 defendant stopped reviewing E/M service codes altogether. Thus, relator claims that physicians were free to upcode without being discovered and had an incentive to do so because their pay was tied to dollars billed. Relator argues that it can be plausibly inferred, based on the foregoing, that defendant submitted fraudulent claims for E/M services.

Relator's allegations are sufficiently detailed to survive defendant's Rule 12(b)(6) and 9(b) motions. Although she does not allege that defendant knew that specific requests for reimbursement for E/M services were false, she claims that defendant ignored audits disclosing a high rate of upcoding and ultimately eliminated audits altogether. These allegations plausibly suggests that defendant acted with reckless disregard for the truth and submitted some false claims. Defendant responds that coding decisions are subjective and that most of the errors alleged involve only one-level coding differences. While a one-level coding difference might reflect a legitimate difference of opinion as to the value of the services provided, it could also result from wrongful upcoding and from defendant's failure to review bills that it had reason to believe contained errors. Defendant also contends that relator does not establish that it failed to provide the services it billed for rather than simply an absence of medical documentation. To succeed on the merits, relator must establish

6

that defendant did not actually provide services it billed for, but she need not prove this in her complaint. *See Lusby*, 570 F.3d at 855 ("To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)."). An absence of medical documentation is sufficient to support a plausible claim of fraud.

Relator also states a plausible claim for relief under the amended reverse false claim provision of the FCA for overpayments withheld after May 20, 2009. If the government overpaid defendant for E/M services and defendant intentionally refused to investigate the possibility that it was overpaid, it may have unlawfully avoided an obligation to pay money to the government. Relator's allegations, however, are insufficient to state a claim under the pre-FERA FCA or the Wisconsin FCA because she does not allege that defendant made false statements to conceal overpayments for E/M services.

## B. Hemoccult Tests

Relator's next claim relating to E/M Services is that Dr. Bradley Fedderly improperly included CPT code 88270 for a Hemoccult test, which detects blood in a stool, on claim forms submitted to Medicare and Medicaid for office visits even though payment for the office visits included payment for such tests. She alleges that two audits in 2010 revealed Fedderly's billing errors. Defendant responds that CMS rules permitted Fedderly to bill separately for some Hemoccult tests. Even assuming, however, that Fedderly wrongly attempted to double bill, relator does not state a plausible fraud claim. She does not allege that defendant actually submitted any of Fedderly's claims to the government. Rather, she alleges that she personally held education sessions with Fedderly, and that defendant

7

corrected his errors before seeking reimbursement. Thus, defendant's Rule 12(b)(6) motion must be granted as to this claim.

### C. Children's Vaccinations

Relator's next E/M Services related claim is that defendant committed Medicaid fraud by adding CPT code 99211 to all claim forms for children's vaccinations even where the medical documentation did not indicate that the physician delivered services beyond a vaccination. Defendant responds that a service under CPT 99211, the code for the lowest level of E/M Services, is so brief that it does not need to be documented. Even so, CPT 99211 represents a separate service and cannot be automatically added every time a child is vaccinated. *See* American Academy of Pediatrics, *When is it Appropriate to Report 99211 During Immunization Administration?* (January 1, 2011). Nevertheless, relator's claim is insufficiently particularized to survive defendant's Rule 9(b) challenge. Relator alleges that she observed defendant implement a policy of automatically adding CPT 99211 to claim forms for vaccinations, but she does not say when the policy was implemented nor does she identify any individuals involved. In addition, she provides no examples of fraudulent claims that defendant actually submitted to the government. This claim requires more detail to satisfy Rule 9(b).

### D. Preoperative Visits

Relator's final E/M Services related claim is that physicians billed Medicare for preoperative visits by characterizing them as office visits under CPT 99213 even though preoperative visits are included in the billing codes for surgical procedures. Relator alleges that she held several education sessions with Dr. Jonathan Berry regarding this issue but

8

that Berry and others continued to bill for pre-operative visits using CPT 99213. Relator's claim again runs into a particularity problem under Rule 9(b). Relator does not specify how often Berry double-billed or when, and she provides no examples of his double billing. Nor does she indicate that other physicians engaged in such conduct.

**II. Alleged Fraudulent Claims Involving Pre-MRI Orbital X-rays**

Relator next claims that defendant submitted fraudulent claims to Medicare and Medicaid for x-raying the orbits of patients' eyes. She alleges that before June 6, 2011, radiologists employed by defendants asked patients who were to undergo an MRI if they had worked with metal. If a patient answered affirmatively (thus indicating the possibility of metal fragments around the eyes which can cause problems during an MRI), the radiologist would x-ray the patient's orbits before conducting the MRI. If the patient was covered by Medicare or Medicaid, defendant would then bill for the government for the procedure. Relator contends that this practice was improper because Medicare and Medicaid require that a physician order a procedure and no physician ordered the orbital x-rays. Defendant responds that relator fails to state a claim for Medicaid fraud because she identifies only Medicare patients in the complaint. However, this argument fails because relator alleges that defendant applied the same policy to all patients. Defendant also asserts that the practice was the result of a standing order promulgated by its physicians. While the existence of a standing order may ultimately doom relator's claim, defendant's response raises a question of fact which I cannot resolve at this stage of the case. On its face, the complaint states a plausible claim of fraud. The complaint also states a plausible claim under the amended reverse false claim provision of the FCA for

9

withholding overpayments for orbital x-rays after May 20, 2009. However, relator fails to allege that defendant made statements designed to conceal overpayments, thus I will dismiss her claims under the reverse false claim provisions of the pre-FERA FCA and the Wisconsin FCA.

## III. Alleged Fraudulent Claims Involving Physician Assistants' Services

Relator next claims that defendant unlawfully sought reimbursement from Medicare and Medicaid for services by physician assistants ("PAs") who were not supervised by physicians in violation of 42 U.S.C. § 1395x(s)(2). This statute provides that Medicare covers only PA services rendered "incident to" a physician's services. As an example of this fraud, she alleges claims that in October 2008 and February 2009 PA John Vieau treated Medicare patients L.A. and J.S. without physician supervision, and that defendant fraudulently added Dr. Paul Robey's name to the claim forms for Vieau's services. Relator fails to state a claim for Medicaid fraud because she cites a statute applicable only to Medicare. Her Medicare claim also lacks the particularity required by Rule 9(b). Relator provides almost no details about the alleged wrongful billing practice. She does not indicate who was responsible for the alleged unlawful billing or who added Robey's name to the claim form for Vieau's services. Relator, however, may proceed under the amended reverse false claim provision of the FCA because she alleges that she notified defendant of the errors in the bills for Vieau's services and that defendant took no action to correct them. Thus, she plausibly alleges that defendant knowingly and improperly avoided an obligation to return an overpayment for Vieau's services.

Case 2:11-cv-00892-LA   Filed 03/28/13   Page 10 of 16   Document 38

## IV. Alleged Fraudulent Claims Involving Pap Smears

Relator next claims that prior to April 8, 2011 defendant submitted fraudulent Medicare claims by improperly coding screening pap smears as diagnostic pap smears. Medicare pays for one annual screening pap smear and additional pap smears only if necessary to diagnose an ailment. 42 U.S.C. §§ 1395x(nn), 1395y(a)(1)(F). Relator alleges that defendant tried to maximize its reimbursement by coding some screening pap smears as diagnostic pap smears using CPT Q0091. CPT Q0091, however, is the proper code for a screening pap smear. Thus, if defendant engaged in the conduct alleged, the effect would have been to code some covered diagnostic pap smears as unreimbursable screening pap smears. Thus, this claim fails.

## V. Alleged Fraudulent Claims Involving Ultrasounds

Relator next alleges that defendant double billed Medicare for follow-up ultrasounds after endovenous laser treatments ("EVLTs"), treatments used to shrink varicose veins. A patient receives three ultrasounds as part of an EVLT. A physician uses an ultrasound to map the veins before the treatment, another as guidance during the treatment, and a third to view the patient's veins during the week following the treatment. Relator alleges that follow-up ultrasounds are included in the code for an EVLT but that defendant fraudulently directed its physicians to bill separately for them. However, relator now concedes that only intra-operative ultrasounds are included in the code. Thus, defendant properly submitted separate bills for these procedures, and relator's fraud claim must be dismissed.

11

## VI. Alleged Fraudulent Claims Involving Stamped Signatures

Relator next claims that defendant fraudulently submitted claims to Medicare supported by documentation containing only a physician's stamped signature. CMS's Medicare Manual requires that services provided be authenticated by "a handwritten or electronic signature" and that "[s]tamped signatures are not acceptable." CMS Internet Only Manual 100-08, Chapter 3, § 3.3.2.4. Relator alleges that Dr. Frank LaVora used stamped signatures and that defendant warned him many times that Medicare banned this practice. She then alleges that "[o]n information and belief, [defendant's physicians] use stamped signatures even though Relator has educated the [physicians] numerous time that Medicare regulations prohibit stamped signatures." (Am. Compl. ¶ 156.) Relator's allegations are insufficiently particularized to state a claim. Relator names only one physician and notes that defendant continually warned him. Moreover, she does not allege that LaVora billed for any services that he did not actually provide. The fact that he used a signature stamp does not mean that claims for payment for his services were fraudulent.

## VII. Alleged Fraudulent Claims Involving Nursing Home Visits

Relator next claims that defendant is overbilling Medicare for visits with patients in nursing homes. Relator alleges that defendant's physicians only visit its Skilled Nursing and Long Term Care Facilities one day per month. As a result, non-physician practitioners handle the initial comprehensive exams for patients admitted or readmitted to a facility on a different day of the month even when Medicare requires that these visits be attended by a physician. Relator bases this claim on a May 19, 2011 statement from non-physician practitioners Karen Wasiullah and Mary Muth that defendant's physicians "were not

12

performing initial comprehensive visits as required by Medicare for patients who were readmitted to [a facility] after inpatient treatment at hospitals." (Am. Compl. ¶ 166.) Relator's claim relating to new admittees fails because she alleges that Wasiullah and Muth spoke only of readmissions, and her claim with respect to readmittees lacks the particularity required by Rule 9(b). Medicare regulations do not require a physician's presence at a readmission unless there has been a "significant change in the resident's physical or mental condition." 42 C.F.R. § 483.20(b)(2)(I). Relator does not allege that a physician failed to handle any readmission where the patient had experienced such a change in condition. Rather, she alleges only that physicians generally mishandled readmissions. Thus, relator's claims relating to nursing home visits fail.

## VIII. Alleged Fraudulent Claims Involving Home Care Services

Relator next claims that defendant defrauded Medicare by wrongly using non-physician practitioners to provide home care visits to patients. Relator alleges both that defendant used non-physician practitioners to conduct visits that were not medically necessary and to visit patients already served by home health agencies. Arguably, both practices would violate Medicare regulations. *See* CMS Internet Only Manual, chapter 12, §§ 30.6.14, 30.6.14.1. However, relator offers little factual support for either allegation. She alleges that several unidentified non-physician and nurse practitioners told her that defendant directed them to bill Medicare for home visits for patients who they did not believe qualified. But none of the informants provided relator with any specific examples, and none said they actually billed Medicare for such visits. Relator further alleges that Dr. Wasiullah established a program in which nurse practitioners visited patients within 48

13

hours of their having been discharged from the hospital even if they were under the care of a home health agency. Relator, however, provides no details about the program such as when Wasiullah set it up or its duration. She also undermines the claim by alleging that at defendants's request she did a powerpoint presentation for nurse practitioners to educate them about when to bill for home visits. This suggests an effort by defendant to comply with the applicable regulations. In sum, relator's allegations fail under Rule 9(b).

## IX. Alleged Fraudulent Claims Involving Residents

Relator next claims that defendant improperly billed Medicare for services provided by residents whom relator refers to as "students." With some exceptions, Medicare requires that records for care provided by residents document that "the teaching physician was present at the time the service [was] furnished." 42 C.F.R. § 415.172(b). Relator alleges that in 2011 two physicians employed by defendant, Doctors Rosner and Sauter, acknowledged that they had not properly documented services provided by residents under their supervision. This resulted in defendant directing them to correct their documentation commencing in 2010. Relator alleges that by failing to review pre-2010 documentation, defendant knowingly withheld pre-2010 overpayments in violation of the reverse false claim provision of the FCA. However, relator alleges no facts suggesting that defendant actually received overpayments for Doctors Rosner or Sauter's services. The doctors acknowledged failing to document their supervision of residents not failing to supervise them. Further, relator does not allege that the review of past records revealed that the government improperly paid any claims. Thus, relator's claim is speculative and cannot survive under Rule 9(b).

14

## X. Retaliation Claim

Relator's last claim is that defendant wrongly discharged her in retaliation for her whistle-blowing. The FCA prohibits an employer from discharging an employee for lawful acts "in furtherance of" an FCA action or for "other efforts" to prevent violations of the statute. 31 U.S.C. § 3730(h). Similarly, the Wisconsin FCA prohibits an employer from discharging an employee for lawful acts "in furtherance of" an action under that statute. Wis. Stat. § 20.931(14). To state a retaliation claim, relator must allege that she engaged in protected conduct and that her discharge was motivated at least in part by that conduct. *See Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012). Relator's allegations satisfy these requirements. She alleges that she investigated and discovered multiple instances of fraud, kept records and reported her findings to defendant, and that defendant responded by telling her to stop "digg[ing] up problems," requiring her to meet with a supervisor and then discharging her. (Am. Compl. ¶¶ 190, 193.) Because the Wisconsin FCA only protects the actions she took in furtherance of the present *qui tam* action, to prevail relator will ultimately need to prove that defendant was "on notice of the distinct possibility of a *qui tam* action" before it fired her. *See Fanslow v. Chicago Mfg. Center, Inc.*, 384 F.3d 469, 483 (7th Cir. 2004)*.* This might prove difficult. *See Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 945 (7th Cir. 2002) ("Brandon's investigation of the billing reports was part of the general course of his responsibilities. . . . Thus, the fact that Brandon was alerting his supervisors to the possibility of their non-compliance with the rules would not necessarily put them on notice that he was planning to take a far more aggressive step and bring a *qui tam* action . . . .").

15

Nevertheless, relator alleges enough to plausibly suggest that defendant fired her because of actions she took in furtherance of this action. Therefore, her retaliation claim survives defendant's motion.

**THEREFORE, IT IS ORDERED** that defendant's motion to dismiss the first amended complaint (Docket #23) is **GRANTED IN PART** and **DENIED IN PART** as indicated above.

**IT IS FURTHER ORDERED** that relator has **thirty (30) days** from the date of this order to **AMEND** her complaint.

Dated at Milwaukee, Wisconsin, this 28th day of March 2013.

s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge

16